1
2
3
4
5
6
7

8              UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| 11  YVONNE W.,[1] | Case No.:  22cv390-BEN(LR) |
| 12                          Plaintiff, | **REPORT AND** |
| 13  v. | **RECOMMENDATION REGARDING** |
| 14  KILOLO KIJAKAZI, Acting | **JOINT MOTION FOR JUDICIAL** |
| 15  Commissioner of the Social Security | **REVIEW** |
| 16  Administration, | **[ECF No. 18]** |
| 17                          Defendant. | |

18

19      This Report and Recommendation is submitted to the Honorable Roger T. Benitez,

20  United States District Judge, pursuant to 28 U.S.C. § 636(b)(1) and Civil Local Rule

21  72.1(c) of the United States District Court for the Southern District of California.  On

22  March 24, 2022, Plaintiff Yvonne W. ("Plaintiff") filed a Complaint pursuant to 42

23  U.S.C. § 405(g) seeking judicial review of a decision by the Commissioner of Social

24  Security ("Defendant") denying Plaintiff's application for a period of disability and

25  disability insurance benefits.  (Compl., ECF No. 1.)

26  _____

27

28  [1] In the interest of privacy, this Report and Recommendation uses only the first name and initial of the last name of the non-government party or parties in this case.  <u>See</u> S.D. Cal. Civ. R. 7.1(e)(6)(b).

Now pending before the Court is the parties' "Joint Motion for Judicial Review of Final Decision of the Commissioner of Social Security."  (See J. Mot. Judicial Review, ECF No. 18 ("J. Mot.").)  For the reasons set forth below, the Court **RECOMMENDS** that Judge Benitez **AFFIRM** the Commissioner's decision.

## I.       PROCEDURAL BACKGROUND

On April 30, 2019, Plaintiff filed an application for supplemental social security income benefits under Title XVI of the Social Security Act, alleging disability beginning on April 1, 2017.  (ECF No. 13 ("AR")[2] at 15, 67, 85, 176.)  After her application was denied initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (Id. at 117.)  On January 26, 2021, a hearing was held before ALJ Eric Benham, during which Plaintiff was represented by counsel.  (Id. at 44–65.)  A vocational expert ("VE") was also present at the hearing (See id.)  On March 1, 2021, the ALJ found that Plaintiff was not disabled since the application filing date on April 30, 2019.  (See id. at 38.)  On April 2, 2021, Plaintiff requested that the Appeals Council review the ALJ's decision.  (See id. at 174–175.)

On January 19, 2022, the Appeals Council denied Plaintiff's request to review the ALJ's decision.  (See id. at 1–3.)  Plaintiff filed the instant civil action on March 24, 2022.  (See Compl., ECF No. 1.)

## II.      SUMMARY OF THE ALJ'S FINDINGS

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since April 30, 2019, the application date.  (See AR at 17.)  At step two, the ALJ found that Plaintiff had the following severe impairments:

> mitral valve endocarditis, heart failure, and cardio-respiratory
> failure secondary to methamphetamine abuse (status post-mitral

---

[2] "AR" refers to the Administrative Record filed on September 9, 2022.  (ECF No. 13.)  The Court's citations to the AR in this Report and Recommendation are to the pages listed on the original document rather than the page numbers designated by the Court's Case Management/Electronic Case Filing System ("CM/ECF").  For all other documents, the Court's citations are to the page numbers affixed by CM/ECF.

> valve repair in March of 2016); hypertension; status post-cardioembolic strokes with encephalomalacia; history of pulmonary embolism and deep venous thrombosis; hypertension; chronic kidney disease stage 3; history of right ankle fracture (status post-open reduction and internal fixation, with one broken surgical screw); and obesity.

(Id.)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in the Commissioner's Listing of Impairments.  (Id. at 23.)  Next, the ALJ determined that Plaintiff has the residual functional capacity ("RFC") to do the following:

> perform sedentary work as defined in 20 CFR 416.967(a) provided that: the claimant can lift 10 pounds occasionally and less than 10 pounds frequently; the claimant can stand and/or walk for 2 hours in an 8-hour workday; the claimant can sit for 6 hours in an 8-hour workday; the claimant can never crawl or climb ladders, scaffolds, or stairs; the claimant can occasionally stoop, crouch, and kneel; the claimant must avoid concentrated exposure to extreme heat; the claimant must avoid all exposure to workplace hazards; and due to symptoms of fatigue secondary to her severe physical impairments, the claimant is limited to performing simple work.

(Id. at 25.)

At step four, the ALJ accepted and cited the VE's testimony that a hypothetical person with Plaintiff's vocational profile and RFC would be unable to perform her past relevant work.  (See id. at 36–37.)  The ALJ then proceeded to step five of the sequential evaluation process.  (See id. at 37.)  Based on the VE's testimony that a hypothetical person with Plaintiff's vocational profile and RFC could make a successful adjustment to other work that exists in significant numbers in the national economy, the ALJ found that Plaintiff was not disabled.  (See id. at 38.)

In determining that Plaintiff was not disabled, the ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that Plaintiff's statements "concerning the intensity, persistence and limiting effects

of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."  (Id. at 26.)

### III.    DISPUTED ISSUES

The parties' Joint Motion for Judicial Review raises two issues as grounds for remand of the ALJ's decision:

1.    Whether the ALJ properly evaluated Plaintiff's subjective symptom testimony.  (J. Mot. at 5:17–20 ("[T]he ALJ provides absolutely no discussion as to why these [daily] activities are inconsistent" and does not "explain in any way that he does not believe that [Plaintiff] is suffering from 'chronic pain[.]'"); id. at 8:2–3 ("The ALJ's evaluation of Plaintiff's subjective allegations was proper and supported by substantial evidence.").)

2.    Whether the ALJ properly relied on the testimony of the VE.  (J. Mot. at 15:25–27, 16:8 ("[T]he ALJ never asked the VE if his testimony conflicted with the Dictionary of Occupational Titles ("DOT") as is required" and "does not explain what is meant by a 'workplace hazard[.]'"); id. at 17:6–7 ("Even ignoring, arguendo, Plaintiff's waiver issue, her attempt to manufacture a conflict between her RFC precluding her from workplace hazards and the representative step-five occupations are unpersuasive.").)

### IV.    STANDARD OF REVIEW

Section 405(g) of the Social Security Act allows unsuccessful applicants to seek judicial review of the Commissioner's final decision.  42 U.S.C. § 405(g).  The scope of judicial review is limited, and the denial of benefits will not be disturbed if it is supported by substantial evidence in the record and contains no legal error.  See Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir. 2012), superseded by regulation on other grounds.

The Court must affirm the Commissioner's decision if it is "supported by substantial evidence and based on the application of correct legal standards."  Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997) (per curiam).  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).  Substantial

evidence means "more than a mere scintilla but less than a preponderance." Id.  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "weigh both the evidence that supports and the evidence that detracts from the ALJ's factual conclusions." Gutierrez v. Comm'r Soc. Sec., 740 F.3d 519, 523 (9th Cir. 2014) (internal quotation omitted).  When evidence is "susceptible to more than one rational interpretation, one of which supports the ALJ's decision," the Court must uphold the ALJ's conclusion. Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). The Court may consider "only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which [he or she] did not rely." Revels v. Berryhill, 874 F.3d 648, 654 (9th Cir. 2017) (internal quotation omitted).

Error in a social security determination is subject to a harmless error analysis. Ludwig v. Astrue, 681 F.3d 1047, 1054 (9th Cir. 2012).  "[A]n error is harmless so long as there remains substantial evidence supporting the ALJ's decision and the error does not negate the validity of the ALJ's ultimate conclusion." Molina, 674 F.3d at 1115 (internal quotation omitted).  The Court must "look at the record as a whole to determine whether the error alters the outcome of the case." Id.

## V.     DISCUSSION

### A.     The ALJ's Evaluation of Subjective Symptom Testimony

#### 1.     Parties' Arguments

Plaintiff argues that the ALJ improperly rejected her testimony regarding subjective symptoms by failing to "account[] for why the ALJ does not believe that [Plaintiff]'s pain is causing subjective symptoms which would add restrictions to her [RFC], and a proper discussion of her other subjective symptoms." (J. Mot. at 4:28–5:3.) Specifically, Plaintiff alleges that the ALJ discounted her testimony during the hearing regarding the symptoms "shortness of breath" and "chronic pain" based on the following daily activities: "watching television, going on the internet, managing money, and using public transportation." (Id. at 5:3–9, 5:11–13.)  Properly considered under Plaintiff's arguments, these symptoms would have reasonably led the ALJ to assess the same

limitations as those noted by one of Plaintiff's treating healthcare providers—Marites Macasadia, P.A.—who opined that Plaintiff would be off task for more than twenty percent of the time in an eight-hour workday and would likely be absent more than three times in a typical workweek.  (See id. at 4:27-5:3 ("What is missing from this discussion is any accounting for why the ALJ does not believe that [Plaintiff's] pain is causing subjective symptoms which would add restrictions to [her] [RFC], and a proper discussion of her subjective symptoms.").)

Defendant contends that the ALJ's findings were proper because Plaintiff failed to provide corroborating evidence sufficient to substantiate her claims.  (See id. at 8:16–18.)  Specifically, Defendant cites to several portions of the ALJ's opinion, including: failure of the medical evidence to support Plaintiff's claims of mental limitations, (see id. at 8:19–9:28), inconsistencies between Plaintiff's statements and behavior, (see id. at 10:1–24), failure to cooperate at the consultative examination, (see id. at 10:25–11:8), demonstrated capabilities undermining Plaintiff's alleged limitations, (see id. at 11:9–27), and Plaintiff's work history undermining her allegations of disability, (see id. at 12:1–15).  These elements, as Defendant argues, were sufficient for the ALJ to reject Plaintiff's subjective symptom testimony.  (See id. at 12:16-27.)

## 2. Relevant factual background

### a. Relevant pain in chronic pain analysis

Plaintiff quotes a Gateway Medical Group's physician's assistant Marites Macasadia's "Medical Source Statement" when referencing chronic pain.  (See J. Mot. at 5:3–7, 5:20 ("This evidence is in the form of a statement from a physician assistant named Marities [sic] Macasadia[.]").)  P.A. Macasadia stated that Plaintiff's diagnoses are as follows:[3] "antiphospholipid antibody syndrome, [congestive heart failure], atrial

---

[3] The other diagnoses in P.A. Macasadia's medical source statement do not appear to be linked to any other mentions of pain in the record.  (See, e.g., id. at 300, 305, 318, 588, 593) (noting isolated instances of pain unrelated to shortness of breath or chronic pain, usually in the form of wounds on Plaintiff's hand and ankle).  Therefore, Ms. Macasadia likely based her statements on chest pain.

fibrillation, transient cerebral ischemia, and [chronic kidney disease]." (AR at 1587.) Additionally, in a portion of the medical source statement that asks which impairments would cause Plaintiff's off-task behavior, P.A. Macasadia wrote "shortness of breath" and "chronic pain." (Id. at 1590.)

The record displays multiple instances where Plaintiff alleges both chest pain and shortness of breath together. In Plaintiff's submitted document from December 2019 titled "Heart Problem," Plaintiff alleges both chest pain and shortness of breath. (Id. at 235.) In Plaintiff's Disability Report Appeal from December 2019, Plaintiff states that both "[c]hest pain and shortness of breath" were treated or evaluated at Scripps Mercy Hospital in June 2019 and Emergency Room visits in 2019. (Id. at 244–245.)

Additionally, while the record notes that Plaintiff had specific instances of ankle pain and index finger pain in the record, these issues are not referenced from the date of P.A. Macasadia's first contact with Plaintiff, which was on May 7, 2020. During this initial visit with Gateway Medical Group of San Diego, Gustavo Mondrago, M.D., noted "heart issues and lung issues." (Id. at 1628.) In the months following, Gateway Medical Group makes no mention of ankle or index finger pain. (See generally id. 1600–1632.) Because P.A. Macasadia's facility does not reference Plaintiff's other long-lasting pain in the record, but does reference Plaintiff's heart and lung issues, the Court will construe "chronic pain" to refer to Plaintiff's chest pain. Thus, the following section will primarily focus on instances of chest pain and shortness of breath in the Administrative Record, rather than other mentions of pain that are less likely to be tied to P.A. Macasadia's limitations statement.

### b. Medical history

On December 29, 2017, at roughly 11:00 PM, Plaintiff walked into the Emergency Department at Sharp Memorial Hospital. (See id. at 338, 627.) In her triage with Michael Anthony Castro, a registered nurse, she had a chief complaint of pelvic pain and also complaints of "chest pressure" and "shortness of breath." (Id.) Within an hour, Stephen Beckham, M.D., ordered both a chest x-ray and an ECG measurement as a result

7

of this chest pain, which found "no acute abnormalities," "clear" lungs, "no pleural effusion or pneumothorax," "mild cardiomegaly," a "[n]ormal sinus rhythm," and "T wave abnormality." (Id. at 347–348, 433, 636–637.) An hour after the x-ray, Plaintiff denied chest pain and shortness of breath when speaking with Dr. Beckham. (See id. at 338, 627.) During Plaintiff's physical exam, Dr. Beckham found that her respiratory system was "clear to auscultation bilaterally" with "[n]o wheezes or rhonchi." (Id. at 339, 628.)

On August 31, 2018, Plaintiff returned to the Emergency Department at Sharp Memorial Hospital with a chief complaint of "[i]ncreasing pain and swelling of the left index finger." (Id. at 318.) Plaintiff reported no shortness of breath and no chest pain during this visit. (See id. at 322.)

On March 18, 2019, at roughly 10:00 PM, Plaintiff arrived at the Emergency Department at Sharp Memorial Hospital from a private vehicle with a chief complaint of ankle swelling and pain. (See id. at 305, 593.) Plaintiff made no mention of chest pain or shortness of breath during triage but endorsed "feeling increasingly short of breath over the past several days" and "den[ied] any chest pain" to Ariel Bowman, M.D. (Id.) During her physical exam, Dr. Bowman noted "[n]o tachypnea or accessor muscle use," "good respiratory effort without wheezes, rhonchi, or rales," and lungs "clear to auscultation bilaterally." (Id. at 306, 594.) The emergency department performed a CT angiography with intravenous contrast of her chest because of her "history of [pulmonary embolism], not [being] on anticoagulation [medication], and progressive shortness of breath" and found "groundglass opacities in both lungs with edema or infiltrates," "cardiomegaly," and "no evidence for pulmonary embolism, thoracic aortic aneurysm, or thoracic aortic dissection." (Id. at 308, 309, 596, 597.) Dr. Bowman noted no pulmonary embolus, but that the findings could still be consistent with a pulmonary edema. (See id. at 309, 597.) Dr. Bowman recommended a follow-up with Plaintiff's primary care doctor to get an echocardiogram because of the fluid in her lungs, and discharged Plaintiff on March 19, 2019. (See id.)

On April 26, 2019, Plaintiff arrived at the Emergency Department at Sharp Memorial Hospital from a private vehicle with a chief complaint of ankle pain.  (See id. at 300, 588.)  Plaintiff denied shortness of breath at this visit.  (See id.)

On May 22, 2019, Plaintiff arrived at the Hillcrest Emergency Department from walking with a chief complaint of right leg pain.  (See id. at 1460.)  At 6:28 PM, Plaintiff endorsed "shortness of breath for the last two months." but denied chest pain to Matthew Murray, M.D.  (Id. at 1464, 1466.)  At 6:45 PM, Plaintiff denied recent chest pain and shortness of breath to the Registered Nurse, Scott Sniffin.  (Id. at 1467.)  The Emergency Department discharged Plaintiff after she "told [the] RN that she is going outside to smoke" and "eloped."  (Id. at 1468.)

On May 26, 2019, Plaintiff arrived at the Emergency Department at Sharp Memorial Hospital with a chief complaint of right ankle pain and wound.  (See id. at 563.)  Plaintiff endorsed "shortness of breath with exertion" but denied chest pain.  (Id. at 565, 569.)  During Plaintiff's physical exam, Anthony Morocco, M.D., noted that her "lungs [were] clear to auscultation bilaterally."  (Id. at 570.)  During Plaintiff's stay, Dr. Morocco ordered a chest x-ray on May 26, 2019, Marissa Steele, M.D., ordered a NM Lung Ventilation/Perfusion on May 28, 2019, and Stephen Shen, M.D., ordered another chest x-ray.  (See id. at 581, 582, 584.)  The first x-ray displayed "[i]nterval development of hazy groundglass edema or infiltrates in the right mid and lower lung zones."  (Id. at 583.)  The NM Lung Ventilation/Perfusion scan displayed a "moderate decreased perfusion at the left lung base which probably involves 2 segments" but "[n]o other perfusion abnormality."  (Id. at 584.)  The Emergency Department discharged Plaintiff after noting an "intermediate probability for pulmonary embolus" that would "not requir[e] oxygen" and several medications prescribed on May 30, 3019.  (Id. at 561–562.)

On June 10, 2019, Plaintiff arrived at the Emergency Department at Sharp Memorial Hospital by ambulance with a chief complaint of shortness of breath but denied chest pain.  (See id. at 550.)  Stephen Shipley, M.D., noted that Plaintiff had not picked up her medication and "ha[d] not taken any blood thinners since discharge."  (Id.)

During her physical exam, Dr. Shipley noted that her chest was "clear to auscultation." (Id. at 551.)  Dr. Shipley ordered both a chest x-ray and a NM Lung Ventilation/Perfusion and Peter Hoagland, M.D., took an ECG measurement.  (Id. at 555–556, 557.)  The chest x-ray displayed that her lungs had "[h]ypoventilation with right basilar atelectasis."  (Id. at 555.)  The NM Lung Ventilation/Perfusion displayed "3 perfusion mismatches that are likely subsegmental" with a "low to possibly intermediate probability of pulmonary embolic disease."  (Id. at 557.)  The ECG measurement displayed "[n]ormal sinus rhythm," and worse anterior T waves than the previous ECG on May 26, 2019.  (Id. at 558.)  Dr. Shipley instructed Plaintiff to fill her prescriptions, especially Xarelto, and become compliant with her medications.  (See id. at 553.)

On June 20, 2019, Plaintiff visited St Vincent De Paul Village Family Health Center for a follow-up after the hospital visit.  (See id. at 861.)  Plaintiff reported "shortness of breath when lying down but report[ed] no chest pain and no shortness of breath when walking."  (Id. at 864.)  Plaintiff additionally stated that she had still not taken Xarelto.  (Id.)  John Tanner, M.D., performed a physical exam where he noted "no dyspnea," "no dullness, flatness, or hyperresonance" in percussion and normal breath sounds with good air movement with auscultation.  (Id.)

On July 12, 2019, Plaintiff arrived at the Emergency Department at Scripps Mercy Hospital San Diego by ambulance with chief complaints of respiratory distress, wound infection, and vaginal bleeding.  (See id. at 446.)  Plaintiff stated that she was at a clinic for a follow-up when she felt short of breath and weak, with an oxygen saturation "in the 70s with peripheral mottling" before arriving at the hospital.  (Id.)  Plaintiff denied any chest pain and stated that she was taking Xarelto but missed roughly two doses per week. (See id. at 440.)  During her physical, Jeffery Norris, M.D., noted lungs clear to auscultation bilaterally and diminished breath sounds.  (See id. at 459, 462.)  On July 12, 2019, John Taras, M.D., ordered a chest x-ray that displayed a "[s]evere pulmonary edema and/or bilateral pneumonia" and a NM Pulmonary Ventilation/Perfusion that displayed an "intermediate probability for pulmonary embolism" and a 12-Lead ECG

which displayed a "normal sinus rhythm," "[p]ossible left atrial enlargement," "[n]onspecific T wave abnormality," and "[p]rolonged QT."  (Id. at 495, 503, 519.)  The listed reason for this ECG was "chest pain," but Plaintiff denied chest pain to staff.  (Compare id. at 517 ("Reason for exam? . . . Chest Pain") with id. at 440 ("The patient denies any chest pain, either pleuritic or exertional[.]").)  On July 13, 2019, Stanley Nguyen, D.O., ordered a chest CT scan without contrast, which found that the "[b]ilateral perihilar groundglass infiltrates are favored" to be from a pulmonary embolism, but that "atypical or opportunistic infections are not excluded."  (Id. at 504.)  On July 14, 2019, Dr. Nguyen ordered two chest x-rays in different positions which revealed "[g]roundglass consolidations bilaterally."  (Id. at 510.)  On July 15, 2019, Dr. Nguyen ordered another chest x-ray which displayed a "[m]arked interval improvement of the extensive bilateral pulmonary infiltrates."  (Id. at 511.)  On July 16, 2019, Rebecca Shragge, D.O., ordered another chest x-ray which displayed a "[n]ear complete resolution of the bilateral infiltrates."  (Id. at 512.)  On July 17, 2019, Dr. Nguyen ordered a chest CT angiography scan with and without contrast which displayed "[n]o evidence for pulmonary embolism" and that the "[p]reviously noted bilateral infiltrates have essentially resolved."  (Id. at 515–516.)

On July 25, 2019, Plaintiff arrived at the Emergency Department at Sharp Memorial Hospital from a private vehicle with a chief complaint of shortness of breath over the past two days but denied chest pain.  (See id. at 534.)  During her physical, Pankaj Chillar, M.D., noted lungs with "[b]ilateral rales[,] diffusely."  (Id. at 535.)  Dr. Beckham ordered a chest x-ray which displayed "[n]ew perihilar opacities, in the setting of cardiomegaly, pulmonary venous congestion, and previous median sternotomy," which "are likely due to pulmonary edema."  (Id. at 546.)  Plaintiff also had an ECG measurement, which displayed a "[n]ormal sinus rhythm, [p]ossible left atrial enlargement, [and] [p]rolonged QT."  (Id. at 549.)  Both procedures stated that they were due to chest pain, but Plaintiff denied chest pain in the record.  (Compare id. at 546 ("Reason For Exam . . . (XR Chest 1 View) Chest pain; Chest pain") and id. at 549 ("Test

11

Reason: Chest Pain") with id. at 531 ("No chest pain.") and id. at 534 ("Denied any chest pain."))

On July 31, 2019, Plaintiff visited St. Vincent De Paul Village Family Health Center for a follow-up after the hospital visit.  (See id. at 857.)  Here, Plaintiff reported no shortness of breath and no chest pain.  (See id. at 860.)  Loretta Contreras, P.A., performed a physical exam where she noted "no dyspnea," "no wheezing, rales/crackles, or rhonchi," and "normal breath sounds with good air movement.  (Id.)

On August 6, 2019, Plaintiff arrived at the Emergency Department at Sharp Memorial Hospital due to "menorrhagia, anemia, mitral stenosis, [and] congestive heart failure."  (Id. at 796, 810.)  The same day, Joseph Bellezzo, M.D., ordered a chest x-ray for shortness of breath which displayed "[i]mproving bilateral infiltrates."  (Id. at 885–886.)  On August 8, 2019, Jack Yacoo, M.D., ordered a NM Lung Ventilation/Perfusion which displayed a "[l]ow probability of pulmonary embolism."  (Id. at 886.)  On August 10, 2019, Dan Zheng, M.D., ordered a chest x-ray for shortness of breath which displayed "[s]light improvement in the patchy edema/infiltrates."  (Id. at 876, 885.)  On August 12, 2019, Tom Song, M.D., ordered two chest x-rays because of shortness of breath which displayed no acute abnormalities.  (See id. at 876.)

On August 21, 2019, Plaintiff visited St. Vincent De Paul Village Family Health Center.  (See id. at 853.)  Here, Plaintiff reported no shortness of breath and no chest pain.  (See id. at 855.)  Elizabeth Matlock, M.D., performed a physical exam where she noted "[n]o dyspnea" and "[l]ungs clear to auscultation bilaterally."  (Id. at 856.)

In Plaintiff's "Claimant Correspondence" dated December 16, 2019, and titled "HEART PROBLEM," Plaintiff stated that she has chest pain "almost everyday" which "lasts a couple of days" that feels "as if a ton of weight was on top of [her]."  (Id. at 235; see generally id. at 41 (naming the document "Claimant Correspondence").)  Plaintiff also stated that she is short of breath "all the time" when "[she] exert[s] [her]self" which "could last days."  (Id. at 235.)

Plaintiff also submitted a Medical Evidence of Record dated December 16, 2019,

and titled "PAIN QUESTIONNAIRE," Plaintiff stated that she has had daily pain "in the middle of [her] chest" that began "about 3-4 years ago." (Id. at 237; see generally id. at 41 (naming the document "Medical Evidence of Record").)  Plaintiff stated that the pain felt like "pressure" that would spread "to [her] stomach and lower back, sometimes," brought on by exertion which "could last days." (Id. at 237.)  Plaintiff claimed that she took metroprolol, lidocaine, and amlodipine "3-4 times daily" for pain and has been taking it for a "few years." (Id.)  Plaintiff claims that the pain first started to affect her activities "3-4 years ago" and stops her activities "every 5 minutes." (Id. at 238.)

On December 22, 2019, Plaintiff arrived at the Emergency Department at Sharp Memorial Hospital from a private vehicle with a chief complaint of shortness of breath but denied chest pain. (See id. at 901.)  During her physical, Christopher Ho, M.D., noted "mild expiratory wheezing heard in the posterior lung fields." (Id. at 902.) Jonathan Gurney, M.D., performed a chest x-ray that displayed "[i]nterval improvement in bilateral infiltrates." (Id. at 902-904.)  Hospital records indicated that Plaintiff was recently discharged from another hospital stay on December 7, 2019, after coming in for shortness of breath and discovering congestive heart failure, but that hospital record is not included in the AR. (See id. at 901, 904.)

In March 2020, Sharp Memorial Hospital took several x-rays of Plaintiff after she presented with pneumonia. (See id. at 1570, 1581–1583.)  On March 15, 2020, Christopher Sebrechts, M.D., performed one chest x-ray due to acute respiratory failure which displayed "[i]ncreased diffuse edema/infiltrates" and "[c]ardiomegaly." (Id. at 1582.)  On March 16, 2020, Dr. Sebrechts performed another chest x-ray due to acute respiratory failure which displayed "[n]o significant change." (Id. at 1581.)  On March 21, 2020, Daniel Hawley, M.D., took two chest x-rays due to pneumonia which displayed "[i]mproved aeration with improved pulmonary vasculature and persistent airspace opacities" with a "[p]attern [that] could represent infection." (Id. at 1583.)

On July 29, 2020, Plaintiff visited the San Diego Cardiac Center for a cardiology follow-up. (See id. at 1614, 1643.)  Plaintiff denied chest pain. (Id.)  During her

physical, Peter Hoagland, M.D., noted that her chest and lungs were "[c]lear to auscultation" with "[n]o wheezing, no crackles, no rales, no rhonchi and normal respiratory rate and rhythm." (Id. at 1615, 1644.)

On October 6, 2020, Plaintiff visited the San Diego Cardiac Center for a cardiology follow-up. (See id. at 1638.) It is unclear whether Plaintiff had chest pain or shortness of breath in this visit but her physical noted that her lungs were "[c]lear to auscultation" with "[n]o wheezing, no crackles, no rales, no rhonchi and normal respiratory rate and rhythm." (Id. at 1638, 1640 ("She has been doing well and [sic] chest pain, shortness of breath and palpitations.").)

On December 4, 2020, Plaintiff visited the San Diego Oncology Medical Clinic for a follow-up. (See id. at 1570.) Plaintiff denied shortness of breath and chest pain and her physical displayed clear breath sounds. (See id. at 1571, 1572.)

### c.   Administrative hearing testimony

On January 26, 2021, Plaintiff appeared with counsel at a hearing held by the ALJ. (See id. at 44.) In the opening statement by Plaintiff's counsel, Plaintiff's counsel did not mention pain or shortness of breath. (See id. at 48–50.) During ALJ questioning, Plaintiff testified that she "get[s] winded very easily" because of "fatigue," rather than pain. (Id. at 53.) During Plaintiff's examination by her counsel, Plaintiff stated that several activities cause fatigue or shortness of breath, including "throwing out [her] trash," "[d]oing [her] laundry," and "just going back and forth." (Id. at 57.) Throughout the entire Administrative Hearing, Plaintiff does not mention any symptoms of pain. (See generally id. at 44–65.)

### d.   P.A. Macasadia's medical statement

On December 1, 2020, physician's assistant Marites Macasadia from Gateway Medical Group completed a "Medical Source Statement" form designed to "determine [Plaintiff]'s ability to do work-related activities on a day-to-day basis in a regular (40 hour) work setting." (Id. at 1587.) In this document, P.A. Macasadia checked a box stating that she "anticipate[d] that [Plaintiff]'s physical impairments, symptoms, or

14

treatment would cause absence from full-time work" "[m]ore than 3 times a month" and left the lines to "[d]escribe which impairments and/or symptoms would cause absences" blank. (<u>Id.</u> at 1589.)  P.A. Macasadia also checked a box stating that she "anticipate[d] [Plaintiff] would be off-task due to pain or other symptoms from physical impairments" and wrote that "shortness of breath" and "chronic pain" would be the causes of this off-task time. (<u>Id.</u> at 1590.)

### e.  State agency physicians' medical findings

The state agency physicians Stuart Laiken, M.D., Ph.D., and R. Bitonte, M.D., reviewed a "sizeable portion" of the medical evidence. (<u>Id.</u> at 34; <u>see also</u> <u>id.</u> at 67–70, 85–89.)  In his Physical Medical Consultant Summary, Dr. Laiken notes "no pulmonary embolus." (<u>Id.</u> at 74.)  In his "Symptoms Evaluation," Dr. Laiken listed "pain" and "fatigue" as claimant's symptoms, but that the "statements about the intensity, persistence, and functionally limiting effects of the symptoms" were not "substantiated by the objective medical evidence alone" and that the allegations were "partially consistent" and "partially credible." (<u>Id.</u> at 76, 93–94.)  In Dr. Laiken's Physical Residual Functional Capacity Assessment "Additional Explanation," he again notes "no pulmonary embolus" and does not mention any shortness of breath or pain in his findings. (<u>Id.</u> at 80; <u>see generally</u> <u>id.</u> at 71–81.)

Dr. Bitonte agreed with Dr. Laiken's findings that "there [was] no evidence compromising [Dr. Laiken's RFC]" and thus he agreed with Dr. Laiken's RFC. (<u>Id.</u> at 91.)  Dr. Bitonte noted that Plaintiff reported the following changed condition: "I often end up at the ER when my pain begins, I can't function as I used to, even the smallest things make me hurt, I simply want to avoid things." (<u>Id.</u> at 91, 96.)  Despite this, Dr. Bitonte still concluded that "[t]here has been no material change in [Plaintiff]'s condition and previously assigned sedentary RFC remains appropriate." (<u>Id.</u>)

### 3.  Applicable Law

The Ninth Circuit has established a two-part test for evaluating a claimant's allegations regarding subjective symptoms.  <u>See</u> <u>Trevizo v. Berryhill</u>, 871 F.3d 664, 678

(9th Cir. 2017), superseded by regulation on other grounds; see also Social Security Ruling ("SSR") 16-3p, 2017 WL 5180304 (Oct. 25, 2017).  First, the ALJ determines whether there is "objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged." Trevizo, 871 F.3d at 678 (quoting Garrison v. Colvin, 759 F.3d 995, 1014–15 (9th Cir. 2014)). Second, if a claimant presented such evidence, and there is no evidence of malingering, the ALJ may reject the claimant's statements about the severity of their symptoms "only by offering specific, clear and convincing reasons for doing so." Id.[4]

When evaluating subjective symptom testimony, "[g]eneral findings are insufficient." Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) (internal quotation omitted).  "[A]n ALJ does not provide specific, clear, and convincing reasons for rejecting a claimant's testimony by simply reciting the medical evidence in support of [their] residual functional capacity determination." Id. at 489.  Instead, the ALJ must identify the testimony regarding the claimant's symptoms that the ALJ finds not credible, and explain what evidence undermines the claimant's testimony.  See Lambert v. Saul, 980 F.3d 1266, 1277 (9th Cir. 2020) (citations omitted); see also Burrell v. Colvin, 775 F. 3d 1133, 1139 (9th Cir. 2014) (finding error where the ALJ "never connected the medical record" to the claimant's testimony, and did not make "a specific finding linking a lack of medical records to [the] [c]laimant's testimony about the intensity" of her symptoms); Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995) (providing that the ALJ's reasons for discounting a claimant's testimony must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discount the claimant's testimony").

---

[4] "[A]ssessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and persistence of symptoms after [the ALJ] find[s] that the individual has a medically determinable impairment(s) that could reasonably be expected to produce those symptoms,' and not to delve into wide-ranging scrutiny of the claimant's character and apparent truthfulness." Trevizo, 871 F.3d at 678 n.5 (quoting SSR 16-3p, 2016 WL 1119029).

"Because symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone," the ALJ considers "all of the evidence presented," including information about the claimant's prior work record, statements about symptoms, evidence from medical sources, and observations by the Agency's employees and other individuals.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); see SSR 16-3p, 2016 WL 1119029.  In addition, the ALJ may consider other factors, such as Plaintiff's daily activities; the location, duration, frequency, and intensity of their pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain; treatment; and any other measures used to relieve pain.  See id.

### 4.   Analysis

The ALJ found—and neither party contests—that Plaintiff has the following severe impairments:

> mitral valve endocarditis, heart failure, and cardio-respiratory failure secondary to methamphetamine abuse (status post-mitral valve repair in March of 2016); hypertension; status post-cardioembolic strokes with encephalomalacia; history of pulmonary embolism and deep venous thrombosis; hypertension; chronic kidney disease stage 3; history of right ankle fracture (status post-open reduction and internal fixation, with one broken surgical screw); and obesity.

(AR at 17 (citing 20 CFR § 416.920(c)).)  Thus, the ALJ concluded that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," satisfying the first prong of the subjective symptom inquiry test.  (Id. at 26.)  Furthermore, neither party alleges that the ALJ found that Plaintiff was malingering.  (See generally J. Mot.)  Accordingly, the Court must determine whether the ALJ provided specific, clear, and convincing reasons for discounting Plaintiff's claims regarding her symptoms.  See Brown-Hunter, 806 F.3d at 489.

As an initial matter, the Court notes that the parties' arguments about the ALJ's discussion of Plaintiff's subjective symptom testimony are somewhat unclear.  Plaintiff alternates between a discussion of her physical symptoms and resulting mental limitations to argue that the ALJ improperly assessed her RFC:

> What is missing from this discussion is any accounting for why the ALJ does not believe that [Plaintiff]'s pain is causing subjective symptoms which would add restrictions to [her] residual functional capacity, and a proper discussion of her other subjective symptoms.  In the record there is evidence that [Plaintiff] would be "off task" more than 20% in a work day and would likely be absent more than 3 times per week caused by "shortness of breath" and "chronic pain."  [AR at 35-36].  This evidence is in the form of a statement from a physician assistant named Marities [sic] Macasadia[].  [Id.]  [Plaintiff] confirms that she is suffering from the subjective symptoms that Ms. Macasadia is relying on in the opinion in [her] testimony at the hearing.  [AR at 52-61.]

(J. Mot. at 4:26–5:9.)  Meanwhile, Defendant argues that the ALJ properly evaluated Plaintiff's *mental* impairments and P.A. Macasadia's limitations assessment without addressing the ALJ's discussion of her physical limitations.  (See id. at 8 n.2 ("Plaintiff challenges the ALJ's evaluation of Plaintiff's allegations of mental limitations, not physical limitations.  Accordingly, [Defendant] focuses on the ALJ's findings concerning Plaintiff's mental RFC.").)  As such, while Plaintiff's argument could reasonably be interpreted to only challenge the ALJ's findings related to the mental limitations *caused* by her physical symptoms of chronic pain and shortness of breath, the Court will endeavor to address both elements of this argument separately insofar as they inform the Court's analysis of the ALJ's decision.

The ALJ identified two reasons for discounting Plaintiff's claims about her symptoms of chronic pain and shortness of breath: (1) that her symptom testimony was inconsistent with the medical evidence in the record, and (2) that her reports about her symptoms were inconsistent with evidence about the effectiveness of the treatments she

received.  (See generally AR at 26-36.)  Additionally, the ALJ identified two reasons for discounting Plaintiff's claims about her symptoms of off-task behavior and absence restrictions: (1) Plaintiff's claims were inconsistent with her testimony about her daily activities (see id. at 36), and (2) Plaintiff's past work performance cast into doubt whether Plaintiff's unemployment was truly due to medical impairments.[5]  (See id. at 33.)  The Court will address the ALJ's discussion of Plaintiff's physical symptoms of shortness of breath and chronic pain before turning to the ALJ's discussion of Plaintiff's work limitations.

### a.    Physical symptoms (chronic pain and shortness of breath)

Plaintiff alleges that "the ALJ does not explain in any way that he does not believe that she is suffering from 'chronic pain'" and shortness of breath.  (J. Mot. at 5:19–21.)  Although Plaintiff does not challenge the ALJ's findings about the medical evidence related to her physical impairments, (see id.. at 4:23-26), the Court finds it helpful at this point in the discussion to note that the ALJ did explain his reasoning for discounting the subjective symptom testimony by appropriately analyzing the medical evidence in the record, as well as pointing to inconsistencies within Plaintiff's statements to discount her subjective symptom testimony.

### i.    The ALJ's evaluation of the medical evidence

One reason that the ALJ provided for discounting Plaintiff's subjective symptom testimony of chronic pain and shortness of breath was that the objective medical evidence in the record does not support Plaintiff's alleged symptoms.  (See AR at 26.)

---

[5] As noted above, Defendant also lists several other rationales that the ALJ used in discounting Plaintiff's subjective symptom testimony, including: (1) medical evidence related to Plaintiff's mental impairments, (2) inconsistencies between Plaintiff's statements and other evidence in the record, and (3) Plaintiff's failure to cooperate at the consultative medical examination.  (See J. Mot. at 8-11.)  These aspects of the ALJ's decision, however, only address Plaintiff's mental impairments, rather than Plaintiff's stated challenge to the ALJ's assessment of her symptoms of chronic pain and shortness of breath, which led to off-task restrictions.  (See id. at 4:27-5:10.)  Accordingly, the Court will address only those aspects of Defendant's argument that directly respond to Plaintiff's challenges and does not address Plaintiff's mental impairments discussed earlier in the ALJ's opinion.

Specifically, the ALJ pointed to: (1) Plaintiff's denial of respiratory problems to medical providers (see id. at 28); (2) unremarkable exam findings (see id.); and (3) lack of evidence regarding oxygen use (see id. at 32).

The ALJ reasoned that "while [Plaintiff] intermittently complained of breathlessness" and respiratory/cardiovascular impairments, Plaintiff "denied respiratory problems" to various medical providers.  (Id. at 28.)  The ALJ supported this reasoning with several citations, including Plaintiff's July 31, 2019, visit to St. Vincent De Paul Village Family Health Center where Plaintiff denied shortness of breath and chest pain (see id. (citing id. at 860)); Plaintiff's December 22, 2019, Emergency Room visit at Sharp Memorial Hospital where Plaintiff denied chest pain (see id. (citing id. at 900)); and Plaintiff's July 31, 2019, visit to St. Vincent De Paul Village Family Health Center where Plaintiff reported no shortness of breath and no chest pain.  (See id. (citing id. at 860).)

Additionally, the ALJ noted many physical exams where the findings were unremarkable.  (See id.)  Specifically, the ALJ referenced "various observations of lungs clear to auscultation, no dyspnea, clear breath sounds, no respiratory distress, good air movements, no wheezes rales, rhonchi, or crackles" (id.), and other unremarkable respiratory and cardiovascular findings at physical examinations performed during many medical visits, including but not limited to: physical examinations performed during Plaintiff's July 12, 2019, Emergency Department visit at Mercy Hospital (see id. (citing id. at 442, 462); Plaintiff's August 19, 2019, Emergency Department visit at Sharp Memorial Hospital (see id. (citing id. at 811)); Plaintiff's July 31, 2019, visit to St. Vincent De Paul Village Family Health Center (see id. (citing id. at 860)); Plaintiff's November 15, 2019, Emergency Department visit at Sharp Memorial Hospital (see id. (citing id. at 895–896)); and Plaintiff's December 22, 2019, Emergency Department visit at Sharp Memorial.  (See id. (citing id. at 901–902).)

Furthermore, the ALJ highlighted the inconsistencies between Plaintiff's statements and objective medical evidence regarding the use of home oxygen to

demonstrate why he discounted some of Plaintiff's impairment allegations.  (See id. at 32.)  Noting that while Plaintiff self-reported using home oxygen to Dr. Ho during her December 22, 2019, visit to Sharp Memorial Hospital, Dr. Ho did not prescribe her any oxygen.  (See id. (citing id. at 901–905).)  Additionally, the ALJ claimed that "there is no persuasive evidence that [Plaintiff] has ever been formally prescribed supplemental oxygen as a treatment modality outside of an inpatient hospital setting" outside of this singular example of Plaintiff's self-reporting.[6]  (See id.)  The ALJ also noted inconsistencies within Plaintiff's own self reporting, including that Plaintiff "does not check her pulse oximetry at home and uses the oxygen purely based on symptoms," as well as that she "does not know what her normal oxygen saturations are at home."  (Id. (citing id. at 901, 905).)

Plaintiff makes no argument disputing the ALJ's finding that the medical evidence does not support her subjective symptom testimony.  Accordingly, the Court concludes that the ALJ's reasoning regarding the lack of medical evidence through denial of symptoms, unremarkable exam findings, and inconsistencies between medical evidence and Plaintiff's testimony were specific, clear, and convincing reasons for discounting Plaintiff's subjective symptom testimony.  See, e.g., Gregory C. v. Kijakazi, No. 4:21-CV-05026-JAG, 2022 WL 17366509 at *3 (E.D. Wash. Sept. 21, 2022) (noting that the ALJ provided a sufficient reason for discounting the plaintiff's subjective reports by pointing to instances in the record where the plaintiff denied symptoms and made no arguments contrary to the ALJ's conclusion); Garcia v. Berryhill, No. EDCV 17-01396-JEM, 2018 WL 5884540 at *4 (C.D. Cal. Nov. 6, 2018) (concluding that the ALJ provided sufficient reasoning where the ALJ pointed to sparse examination findings of symptoms and the plaintiff made no arguments challenging the ALJ's assessment of the medical evidence); Cox v. Berryhill, No. EDCV 17-0544-JPR, 2018 WL 2341752 at *17

_____

[6] The Court also did not find any instance in the record of Plaintiff's prescribed oxygen use or home oxygen as a home treatment modality.

(C.D. Cal. May 22, 2018) (concluding that the ALJ provided sufficient reasoning when the ALJ noted inconsistencies between the plaintiff's complaints and the objective medical evidence and the plaintiff raised no argument directly challenging this finding).

### ii.   Improvement with treatment

The failure of the objective medical evidence to support Plaintiff's statements about her physical symptoms of chronic pain and shortness of breath was only one reason that the ALJ provided for discounting this testimony.  The ALJ provided additional reasoning for discounting these statements by noting that Plaintiff's cardiologic and cardiovascular symptoms had improved with treatment.  (See AR at 28, 29, 30, 31.) Specifically, the ALJ noted Plaintiff's cardiologist's statements regarding Plaintiff's improvements throughout 2020 and that her symptoms were attributed by multiple medical providers to her methamphetamine abuse.  (Id. at 28, 31.)

For example, the ALJ detailed that in Plaintiff's visits to the San Diego Cardiac Center in 2020, her cardiologist, Dr. Hoagland, documented dramatic improvements.  (Id. at 31.)  The ALJ explained that during her July 2020 visit, Dr. Hoagland recorded that Plaintiff was doing "remarkably well" and that "most of [the staff] taking care of her in the Spring would be surprised to see her alive and looking this good" with her lack of chest pain, edema, orthopnea, or paroxysmal nocturnal dyspnea.  (Id. (citing id. at 1614–1617).)  The ALJ further noted her continued improvements in her October 2020, where exams displayed clear lungs and normal respiratory rate and rhythm and Dr. Hoagland noted that she was "doing well." (Id. (citing id. at 1638–1642).)

The ALJ also specified that Plaintiff's "cardiologic and cardiovascular conditions have been formally attributed to her recurring methamphetamine abuse" and notes specific instances in the record of the waxing and waning of symptoms tied to drug use. (Id. at 28 (citing id. at 1593, 1624, 1628); see also id. at 30, 31, 32, 34.)  The ALJ noted that Plaintiff gave conflicting information about her methamphetamine use to medical providers on at least one occasion.  (See id. at 30 ("[Plaintiff] initially self-reported no methamphetamine use 'for a long time,' but subsequently remarked that she 'has not

smoked methamphetamine for a couple [of] weeks now.'" (quoting id. at 460)).)  A separate instance was also noted where the onset of symptoms occurred two days after using methamphetamine and that Plaintiff was "strongly encouraged" by the emergency physician to "seek treatment for her methamphetamine use" before being discharged.  (Id. (quoting id. at 901, 905).)  The ALJ additionally specified that state agency physicians Dr. Laiken and Dr. Bitonte "cited evidence of hospitalizations . . . in the context of methamphetamine use as documented by urine toxicology."  (Id. at 34 (citing id. at 66–82, 84–98).)  Finally, the ALJ identified Dr. Hoagland's comments that Plaintiff "has been clean since March" and that she remained "sober" at her follow-up visit while concurrently showing dramatic improvement.  (Id. at 31 (quoting id. at 1614, 1638).)

In addition to the ALJ's direct discussion of the medical evidence in the record, these examples of improvement with treatment and other inconsistencies were additional specific, clear, and convincing reasons for discounting Plaintiff's physical symptom claims.  See Red v. Colvin, No. 2:15-CV-0069-TOR, 2016 WL 335868, at *4 (E.D. Wash. Jan. 27, 2016) (holding that evidence of improvement provided by the ALJ was sufficient when the plaintiff "makes no argument that the ALJ's chosen examples from the record evidencing improvement with treatment do not demonstrate broader improvement"); Huckaba v. Colvin, No. 2:15-CV-0281-TOR, 2016 WL 4728111 at *6 (E.D. Wash. Sept. 9, 2016) (same).  Notably, apart from the cursory contention that the ALJ did not provide sufficient reasons for discounting her allegations of pain, Plaintiff does not challenge any of the ALJ's reasoning noted above.  (See J. Mot. at 5:19-21 ("Nor, does the ALJ explain in any way that he does not believe that [Plaintiff] is suffering from 'chronic pain' which is part of the reason for the off-task behavior and absence restrictions [from P.A. Macasadia's limitations assessment].").)  This argument amounts to a request for the Court to accept P.A. Macasadia's restrictions assessment over multiple independent reasons that the ALJ used in discounting Plaintiff's statements about her pain and shortness of breath, without any discussion on Plaintiff's part as to

*how* those reasons were invalid.  Accordingly, the Court declines to disturb the ALJ's decision on this basis.

### iii.    Conclusion

The ALJ's decision includes a "discussion of her other subjective symptoms" and an explanation for why "he does not believe that [Plaintiff] is suffering from 'chronic pain'" by analyzing the objective medical record and noting instances of dramatic improvement in Plaintiff's treatment records.  (Id. at 4:27-5:2.)  Plaintiff does not address these findings in her argument—contending instead that the ALJ should have adopted P.A. Macasadia's more severe restrictions assessment.  (J. Mot. at 4-5.)  Even if Plaintiff had presented other evidence in the record to contest these findings, it is not the Court's purview to reassess evidence that is susceptible to more than one rational interpretation.  See Ludwig, 681 F.3d at 1051.  Accordingly, Plaintiff's arguments about the ALJ's analysis of her chronic pain and shortness of breath are insufficient for the Court to disturb the ALJ's findings on this basis.

### b.    Mental restrictions caused by Plaintiff's physical symptoms

As best as the Court can tell, Plaintiff separately claims that her physical subjective symptoms of shortness of breath and chronic pain would cause off-task behavior and absence restrictions that the ALJ failed to account for in his RFC determination.  (J. Mot. at 4:27–5:3 ("What is missing from this discussion is any accounting for why the ALJ does not believe that [Plaintiff]'s pain is causing subjective symptoms which would add restrictions to Ms. Waterbury's residual functional capacity, and a proper discussion of her other subjective symptoms."); id. at 5:19–21 ("Nor, does the ALJ explain in any way that he does not believe that [Plaintiff] is suffering from 'chronic pain' which is part of the reason for the off-task behavior and absence restrictions.").)  Specifically, Plaintiff contends that the ALJ did not properly analyze Plaintiff's reports of her activities of daily living, which the ALJ used to contradict P.A. Macasadia's assessment that Plaintiff

would frequently be off-task during a work day and would be absent from work three days a week.[7]  (See J. Mot. 5:14-19.)

The Court notes at the outset that Plaintiff's arguments on this issue are—yet again—somewhat unclear.  Plaintiff repeatedly conflates the ALJ's discussion about her physical symptoms of chronic pain and shortness of breath with the *restrictions* that these physical symptoms would cause in P.A. Macasadia's medical source statement.  (See J. Mot. at 5:17-19 ("the ALJ provides absolutely no discussion as to why these activities of daily living are inconsistent with [P.A.] Macasadia's opinion or [Plaintiff's] testimony.").)  These are two separate issues that are discussed in the context of different evidence in the record throughout the ALJ's opinion.  Nevertheless, because Plaintiff contends that the ALJ's discussion of her activities of daily living are insufficient to discount P.A. Macasadia's assessment of her off-task behavior and absences (see id. at 5:14-16), the Court will address these restrictions separately.

### i.    Daily activities

In determining that Plaintiff's testimony about her daily activities was inconsistent with her alleged limitations involving off-task behavior and absence restrictions, the ALJ noted that Plaintiff "us[ed] public transportation 'daily' and manag[ed] her own money" (AR at 35 (citing id. at 827)), "watch[ed] television[] and [went] on the internet (Id. at 35 (citing id. at 55)).  The ALJ concluded that "[t]hose reported duties have required varying

---

[7] Plaintiff also argues that the ALJ discounted P.A. Macasadia's opinion "partly due to [her] being a family practice physician assistant." (J. Mot. at 5:10-11.)  As Defendant points out, however, that the ALJ's discussion of P.A. Macasadia's position as a family practice physician's assistant was to explain that she lacked specialized knowledge in cardiology, pulmonary medicine, and neurology.  (See id. at 14 (citing id. at 36).)  Additionally, the ALJ notes that P.A. Macasadia's opinion was inconsistent, and therefore unsupported, by other medical evidence in the record.  (See id. at 33.)  Plaintiff does not make any further arguments in response to Defendant's contentions on reply, and the Court concludes that any error the ALJ made in discounting P.A. Macasadia's opinion due to her lack of specialty knowledge was harmless because he used sufficient reasons to discount P.A. Macasadia's restrictions throughout the opinion.

but significant degrees of attention and concentration" and are inconsistent with claims of "off-task behavior and workplace absences."  (Id. at 35.)

An ALJ may properly consider a claimant's daily activities to evaluate testimony regarding subjective symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i).  Daily living activities may provide a basis for discounting subjective symptoms if the plaintiff's activities (1) contradict their testimony or (2) meet the threshold for transferable work skills.  See Steele v. Berryhill, No. 317CV01923LABRNB, 2018 WL 2718033, at *3 (S.D. Cal. June 6, 2018), report and recommendation adopted, No. 17CV1923-LAB (RNB), 2018 WL 4489658 (S.D. Cal. Sept. 18, 2018) (citing Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007)).  Additionally, "[w]hen the evidence before the ALJ is subject to more than one rational interpretation, [the Court] must defer to the ALJ's conclusion."  Batson v. Comm'r Soc. Sec. Admin., 359 F.3d 1190, 1198 (9th Cir. 2004) (citing Andrews, 53 F.3d at 1041); see also Elizondo v. Astrue, No. 1:09-CV-0989 SKO, 2010 WL 3432261, at *5 (E.D. Cal. Aug. 31, 2010) ("The mere fact of a claimant's carrying on certain daily activities does not necessarily detract from credibility as to overall disability.  However, a negative inference is permissible where the activities contradict the other testimony of the claimant[.]").

Plaintiff argues that the ALJ improperly assumes that these activities of daily living require significant attention and concentration.  (J. Mot. at 6:3–7 ("The ALJ just makes the unsupported opinion that doing those activities of daily living in fact does require significant degrees of sustained attention and concentration.")  Specifically, Plaintiff points to the lack of evidence in the record demonstrating attention and concentration these activities require and the lack of testimony "as to how long [Plaintiff] actually pays attention to television programs she watches, how long she uses the internet before becoming distracted, or any difficulty she has taking public transportation."  (Id. at 6:7–12.)  Plaintiff asserts that because it is the ALJ's duty to ensure a proper record, the ALJ should at least have asked about "how long she pays attention to the television," the extent she "retains knowledge or re-watch[es] material," "how long she stays on the

internet," how long she can concentrate on internet tasks, and "how often [Plaintiff] has problems with public transportation due to concentration."  (Id. at 6:12–19.)  In sum, Plaintiff argues that the ALJ should have considered the extent that Plaintiff can perform the daily activities that she mentioned throughout the record, not just what they were.  (Id. at 7:2–12; id. at 7:22–25 ("Indeed, in order to determine transferability to a work environment, which watching television would be of dubious value, the extent that an activity of daily living is being performed by a claimant would be paramount in making that determination.").)

Plaintiff's arguments about the transferability of watching television, going on the internet, and the use of public transportation to a work environment are well taken.  Plaintiff cites to Woods v. Kijakazi, 888 F.3d 686, 694-95 (4th Cir. 2018) in arguing that the ALJ needed to discuss the extent to which Plaintiff could carry out these activities.  (J. Mot. at 7.)  Ninth Circuit courts have similarly concluded that the mere fact that a claimant can carry out certain activities at home is not sufficient for an ALJ to conclude that these activities can transfer to a work environment.  See, e.g., Smith v. Saul, 820 Fed App'x 582, 603 (9th Cir. 2020) (quoting Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)) ("many home activities are not easily transferrable to what may be the more grueling environment of the workplace . . .").  It is not clear to the Court how watching television, using the internet, and using public transportation, without any further inquiry into the extent of those activities, would require a level of attention and concentration such that they would contradict Plaintiff's subjective symptom testimony about her work restrictions.

Absent from Plaintiff's arguments about the ALJ's evaluation of her daily activities, however, is any mention of the ALJ's citation to her ability to manage her own money in discounting P.A. Macasadia's assessment.  Managing money could require enough attention and concentration such that the ALJ would rationally conclude that this daily activity was inconsistent with Plaintiff's subjective symptom testimony involving these functions in a work environment.  Indeed, numerous cases within the Ninth Circuit

mention managing money as a daily activity that involves attention and concentration. See, e.g., Allen T. v. Saul, No. EDCV 19-1066-KS, 2020 WL 3510871, at *8 (C.D. Cal. June 29, 2020) ("The scope of the activities – various church activities, shopping, managing money, and painting [] – was inconsistent with Plaintiff's allegation that maintaining focus and concentration was a constant struggle."); Gitchell v. Comm'r Soc. Sec., No. 1:21-CV-00157-SAB, 2023 WL 1785914 at *10 (E.D. Cal. Feb. 6, 2023) ("even though Plaintiff alleged difficulty with focus and concentration, the record demonstrated Plaintiff had the ability to complete many activities of daily living, including . . . manag[ing] money"); Tristan v. Comm'r Soc. Sec. Admin., No. CV-20-02240-PHX-DWL, 2022 WL 1707953 at *6 (D. Ariz. May 27, 2022) ("For instance, the ALJ discussed that Plaintiff is able to engage in daily activities that require her to maintain concentration, persistence, and pace, such as with managing her finances, online shopping, and preparing meals.").  The ALJ's citation to Plaintiff's ability to manage her own finances were in direct contrast to P.A. Macasadia's assessed restrictions on her attention and concentration in the workplace.  (See AR at 35-36.)  Thus, Plaintiff's arguments are insufficient for the Court to second guess the ALJ's determination, even if the evidence could plausibly give rise to inferences more favorable to Plaintiff.  Batson, 359 F.3d at 1198 ("When the evidence before the ALJ is subject to more than one rational interpretation, [the Court] must defer to the ALJ's conclusion.") (citing Andrews, 53 F.3d at 1041).  The Court therefore concludes that the ALJ provided at least one legally sufficient reason for discounting Plaintiff's subjective symptom testimony based on daily activities.

### ii.    Work history

In addition to a discussion of Plaintiff's daily activities, Defendant points out that the ALJ found that Plaintiff's past work history belied her statements that her unemployment was due to her subjective symptoms:

> Regarding work activities or plans, during her consultative psychological evaluation in September of 2019, the claimant

reported that she "last work at Resort Com International in 2011." She added that she "had been in this position for approximately 5 years" and "stated that she [sic] San Diego office shut down so she became unemployed and did not look for another job." In short, the claimant acknowledged that her work stopped years prior to the claim application filing date, and for reasons other than her impairments. These factors raise the possibility that matters unrelated to the claimant's impairments may be the reasons for her continuing unemployment.

(AR at 33.)

"Poor work history can provide a permissible reason to cast doubt on Plaintiff's purported reason for unemployment." Red, 2016 WL 335868, at *5 (citing Thomas, 278 F.3d at 959); see also Johns v. Kijakazi, No. 1:20-CV-00362-BAM, 2021 WL 4147195, at *8 (E.D. Cal. Sept. 13, 2021) ("An ALJ may consider work history when evaluating a claimant's credibility."); Dayna R. v. Saul, No. 2:19-CV-00171-MKD, 2020 WL 515857, at *8 (E.D. Wash. Jan. 31, 2020) (noting that the ALJ permissibly considered the claimant's work history when she testified that she stopped working for reasons other than her impairments). Plaintiff does not argue against the ALJ's citation to her work history to discount her statements about the reasons that she stopped working, and the Court declines to disturb the ALJ's decision on this basis as well.

### iii.    Conclusion

The ALJ also properly discounted Plaintiff's subjective symptom testimony involving off-task behavior and absences. Although Plaintiff argues that the ALJ did not properly analyze her daily activities, she fails to address the numerous other reasons that the ALJ gives in favor of discounting Plaintiff's subjective symptom testimony about the limitations that P.A. Macasadia assessed in her medical source statement. (Compare J. Mot. at 6:3–7:27, with AR at 26, 28, 32, 33) (discussing Plaintiff's daily activities and other reports throughout the record in contrast with her reports about her symptoms and P.A. Macasadia's limitations assessment). Accordingly, the Court concludes that the ALJ did not err in rejecting Plaintiff's subjective symptom testimony.

**B.     The ALJ's Reliance on Vocational Expert Testimony**

    **1.     Parties' arguments**

     Plaintiff argues that the ALJ improperly relied on the VE's testimony that conflicted with the Dictionary of Occupational Titles ("DOT").  (J. Mot. at 15:25–26.) Specifically, Plaintiff claims that <u>Massachi v. Astrue</u>, 486 F.3d 1149 (9th Cir. 2007), requires the ALJ to ask if the VE's testimony conflicts with the DOT.  (<u>Id.</u> at 15:27.) Plaintiff further argues that the ALJ's failure to explain the phrase "workplace hazards" in his hypothetical to the VE gives another reason for remand because this "unclear term[]" conflicts with the "industrial nature" of the three positions identified by the VE and the presence of a "conveyor" in two of the job descriptions.  (<u>Id.</u> at 16:8–11.) Plaintiff asserts that the term "conveyor" could constitute a "workplace hazard" due to the presence of moving machine parts and tools, and that the ALJ's failure to explain this term constitutes reversible error.  (<u>Id.</u> at 16:6–16.)

     Defendant contends that Plaintiff has waived any arguments about DOT conflict by failing to raise the issue at the ALJ hearing, citing <u>Meanel v. Apfel</u>, 172 F.3d 1111, 1115 (9th Cir. 1999).  (<u>Id.</u> at 16:19–22.)  Defendant also claims that even if Plaintiff's DOT conflicts were not waived, any potential error was harmless because Plaintiff did not identify an actual conflict between the DOT and the RFC.  (<u>Id.</u> at 17:10–11.)  None of the three step five occupations identified by the VE—as Defendant argues—involve "workplace hazards."  (<u>Id.</u> at 17:24–25; 18:11–14.)  Defendant notes that even for the positions involving work around conveyor belts, the DOT descriptions specifically state that "moving mechanical parts" are "not present" in the performance of these occupations.  (<u>Id.</u> at 10–14.)  Finally, Defendant argues that "workplace hazards" is not an unclear term because the DOT identifies specific examples of the term, which are not present in these occupations.  (<u>Id.</u> at 17:28, 18:6–7, 18:14–17.)

    **2.     Applicable law**

      **a.     Waiver**

The Ninth Circuit in <u>Meanel</u> held that, at least when represented by counsel,

plaintiffs must raise issues at their administrative hearings in order to preserve them on appeal to the district court, unless reviewing the waived issue is necessary to avoid a manifest injustice.  172 F.3d at 1115.  Courts within the Ninth Circuit, however, regularly distinguish <u>Meanel</u> when there is an apparent conflict between the VE's testimony and the DOT at the ALJ hearing because the ALJ bears the burden of proof at step five and thus is under an obligation to clarify any apparent conflict before making a finding. <u>Barbee v. Berryhill</u>, No. 16-CV-1779-BEN-(DHB), 2017 WL 3034531, at *12 (S.D. Cal. July 18, 2017), <u>report and recommendation adopted</u>, No. 316CV01779BENDHB, 2017 WL 3772975 (S.D. Cal. Aug. 31, 2017) (listing cases in the Ninth Circuit declining to apply <u>Meanel</u> due to apparent conflict between the VE's testimony and the DOT); <u>see also</u> <u>Kawther Y. v. Kijakazi</u>, No. 21-CV-01191-BGS, at *3 (S.D. Cal. Mar. 30, 2023) (declining waiver because the ALJ has the burden of proof at step five of the sequential evaluation process and must clarify any apparent conflict before making a finding); <u>Barkzai v. Berryhill</u>, No. 17-CV-1692-W (RNB), 2018 WL 3126093, at *3, <u>report and recommendation adopted</u>, No. 17-CV-1692 W (RNB), 2018 WL 3532912 (S.D. Cal. July 23, 2018) ("The Commissioner's waiver argument is contrary to the foregoing authority and the Court concurs with those California district courts that uniformly continue to reject it."); <u>Quesada v. Berryhill</u>, No. 16CV2716-CAB-KSC, 2017 WL 4518490, at *5 (S.D. Cal. Oct. 10, 2017) (permitting the plaintiff to raise the apparent conflict between the VE's testimony and the DOT despite not raising it at the administrative hearing).

Additionally, in <u>Greger v. Barnhart</u>, the Ninth Circuit noted a pre-existing exception to the general rule that appellate courts will not consider issues raised for the first time on appeal: "when the issue presented is purely one of law and either does not depend on the factual record developed below, or the pertinent record has been fully developed."  464 F.3d 968, 973 (9th Cir. 2006) (quoting <u>Bolker v. C.I.R.</u>, 760 F.2d 1039, 1042 (9th Cir.1985)).  Many Ninth Circuit district courts have extended these appellate court exceptions to social security disability appeals.  <u>See</u> <u>Guerrero v. Berryhill</u>, No. 316CV01229WQHNLS, 2017 WL 4174257, at *3 n.1 (S.D. Cal. Sept. 21, 2017), <u>report</u>

and recommendation adopted, No. 16-CV-1229-WQH-NLS, 2018 WL 823012 (S.D. Cal. Feb. 12, 2018) ("Though the court in Greger addressed issues raised for the first time on federal appeal, the court's reasoning applies equally to issues raised for the first time in the district court."); see, e.g., Razzari v. Berryhill, No. 16-CV-02945-JCS, 2017 WL 6539790, at *5 (N.D. Cal. Dec. 21, 2017) (finding no waiver of an unraised pure question of law); Barbee, 2017 WL 3034531, at *12 (finding no waiver of an unraised pure question of law); Martinez v. Colvin, No. 14CV3043 BTM(WVG), 2017 WL 766665, at *4 (S.D. Cal. Feb. 27, 2017) (holding that purely legal procedural errors may be raised for the first time on appeal) (citations omitted).

### b.   Conflict

At step five of the sequential evaluation process, "the Commissioner has the burden 'to identify specific jobs existing in substantial numbers in the national economy that [a] claimant can perform despite [his] identified limitations.'" Zavalin v. Colvin, 778 F.3d 842, 845 (9th Cir. 2015) (quoting Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995)).  In determining if other suitable work exists that the claimant may be able to perform, the ALJ is to rely on the DOT, and may also rely on the testimony of VEs who testify about specific occupations that a claimant can perform in light of their RFC.  See Zavalin, 778 F.3d at 845–46; Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 689 (9th Cir. 2009).

An ALJ is required to investigate any conflict between the VE's testimony and the DOT, whether or not the claimant raises the conflict.  Shaibi v. Berryhill, 883 F.3d 1102, 1109 (9th Cir. 2017).  The ALJ must ask whether there is any conflict between the VE's testimony and the DOT.  Massachi v. Astrue, 486 F.3d 1149, 1153–1154 (9th Cir. 2007). SSR 004p requires the ALJ to first determine whether there is a conflict between the DOT and the vocational expert's testimony, and then "determine whether the VE's explanation for the conflict is reasonable and whether a basis exists for relying on the expert rather than the [DOT]." Id. at 1153.  "[A]n ALJ may rely on expert testimony which contradicts the DOT, but only insofar as the record contains persuasive evidence to

32

support the deviation." <u>Johnson</u>, 60 F.3d at 1435.  The ALJ's failure to ask about any potential conflict, however, does not automatically require remand, and is analyzed under the harmless error standard.  See <u>Massachi</u>, 486 F.3d at 1154 n.19 ("This procedural error could have been harmless, were there no conflict, or if the vocational expert had provided sufficient support for her conclusion so as to justify any potential conflicts.").

A conflict between the VE's testimony and the DOT exists when the VE's testimony is obviously or apparently contrary to the DOT's listing of job requirements that are "essential, integral, or expected." <u>Gutierrez v. Colvin</u>, 844 F.3d 804, 808 (9th Cir. 2016).  A conflict is "obvious or apparent" when the VE's testimony is at odds with "essential, integral, or expected" requirements of the occupation identified by the VE. <u>Id.</u>; <u>see also</u> <u>Lamear v. Berryhill</u>, 865 F.3d 1201, 1205 (9th Cir. 2017).  The VE's testimony does not conflict with the DOT if the "frequency or necessity of a task is unlikely and foreseeable." <u>Gutierrez</u>, 844 F.3d at 808.  If a conflict exists, the ALJ does not automatically give the DOT or the VE's testimony higher preference. <u>Massachi</u>, 486 F.3d at 1153.  Instead, the ALJ must ask follow-up questions to determine whether the VE's explanation for the conflict is reasonable and whether a basis exists for relying on the expert rather than the DOT.  "The requirement for an ALJ to ask follow-up questions is fact-dependent." <u>Guttierez</u>, 844 F.3d at 808.  "To avoid unnecessary appeals, an ALJ should ordinarily ask the VE to explain in some detail why there is no conflict between the DOT and the applicant's RFC." <u>Lamear</u>, 865 F.3d at 1205.

**3.    Analysis**

**a.    Preservation of Plaintiff's claims**

Following the guidance of many courts within the Ninth Circuit that have distinguished <u>Meanel</u> in the context of conflict between VE testimony and the DOT, the Court disagrees with Defendant's contention that Plaintiff waived her claim of error by not raising it at the administrative hearing.  (See AR at 16:19–22.)  At step five of the sequential evaluation process, Defendant carries the burden to "identify specific jobs existing in substantial numbers in the national economy that [a] claimant can perform

despite . . . identified limitations." <u>Zavalin</u>, 778 F.3d at 845 (alterations in original) (quoting <u>Johnson</u>, 60 F.3d at 1432) (citing 20 C.F.R. § 416.920(g)).  District courts frequently distinguish <u>Meanel</u> when a plaintiff's attorney fails to raise a conflict between the VE's testimony and the DOT during an administrative hearing because the ALJ is obligated to clarify any apparent conflict before making a finding.  <u>See, e.g.</u>, <u>Murry v. Colvin</u>, No. 1:14-CV-01349-JLT, 2016 WL 393859, at *5 (E.D. Cal. Feb. 2, 2016) (declining to apply <u>Meanel</u> because it is the ALJ's obligation to clarify the record and the ALJ bears the burden at step five); <u>Gonzales v. Astrue</u>, No. 1:10-CV-01330-SKO, 2012 WL 2064947, at *4 (E.D. Cal. June 7, 2012) (finding that the plaintiff's representative's failure to challenge inconsistencies between the VE's testimony and the DOT at the time of the hearing does not constitute a waiver of the argument).

Even if Plaintiff had waived the issue, the <u>Greger</u> exception noted above affords the Court discretion to address it.  An ALJ's failure to ask whether there is any conflict between the VE's testimony and the DOT is a procedural error that can be addressed for the first time on appeal.  <u>Compare</u> <u>Massachi</u>, 486 F.3d at 1154 n.19 (concluding that an ALJ's failure to ask the vocational expert whether her testimony conflicted with the DOT is a procedural error), <u>with</u> <u>Martinez</u>, 2017 WL 766665, at *4 (citing <u>Shafer v. Astrue</u>, 518 F.3d 1067, 1071–72 (9th Cir. 2008)) (noting that fundamental procedural errors may be raised for the first time on appeal).  Unlike in <u>Meanel</u>, where the plaintiff relied on new statistical evidence not provided to the ALJ at the hearing or the Appeals Council, the relevant record here has been fully developed, avoiding any prejudice to Defendant that might result from an inability to respond to new factual issues.  <u>See</u> <u>Bishop v. Colvin</u>, No. 3:14-CV-00524-HZ, 2015 WL 1874879, at *7–8 (D. Or. Apr. 23, 2015) (citing <u>Greger</u>, 464 F.3d at 973) (noting that the ALJ's failure to reconcile a conflict at step five is a legal error that can be addressed for the first time on appeal).  Accordingly, the Court concludes that Plaintiff's DOT conflict claim is not waived and will address the merits of that argument below.

### b.    Conflict

The ALJ found that Plaintiff has an RFC that requires her to "avoid all exposure to workplace hazards." (AR at 25.)  The VE categorized Plaintiff's past relevant work as follows: "front desk clerk (DOT 238.367-038, light duty, SVP 4) and a mortgage clerk (DOT 216.362-026, sedentary duty, SVP 3)." (Id. at 36; see also id. at 60.)  The ALJ found that, "in comparing [] the claimant's residual functional capacity with the physical and mental demands of her past relevant work . . . the claimant is unable to return to any past relevant work." (Id. at 37.)

During the administrative hearing, the ALJ asked the VE to consider a hypothetical individual of Plaintiff's age, education, and work experience, who "should avoid any exposure to hazards." (Id. at 61.)  The VE testified that such an individual could perform the work of a bench hand assembler (DOT 715.684-026), a table worker (DOT 739.687-182), and an agricultural sorter (DOT 521.687-086).[8]  (Id. at 61–62.)  It does not appear that the ALJ inquired as to whether the VE's testimony was consistent with the DOT during the hearing.  (See generally AR at 60–64.)  Relying on the VE's testimony regarding the availability of work in significant numbers that corresponded with Plaintiff's RFC, the ALJ determined that Plaintiff would be able to perform the duties of a bench hand assembler (DOT 715.684-026), a table worker (DOT 739.687-182), and an agricultural sorter (DOT 521.687-086).  (Id. at 37–38.)  The ALJ stated in his written opinion that he had "determined that the [VE's] testimony is consistent with the

---

[8] The occupation in DOT 521.687–086 is labeled as "Nut Sorter," but the Court does not consider this occupation name erroneous because numerous Ninth Circuit district courts have used the DOT occupations of nut sorter and agricultural sorter interchangeably.  See, e.g., Kim v. Berryhill, Case No. 17-cv-6807-E, 2018 WL 851310 at *1 (C.D. Cal. Feb. 13, 2018); Barron v. Berryhill, Case No. CV 16-cv-1420-PLA, 2017 WL 1054185 at *3 (C.D. Cal. Mar. 20, 2017); Binger v. Astrue, Case No. 08-cv-0852-RC, 2009 WL 2848999 at *6 (C.D. Cal. Aug. 31, 2009).  The DOT also notes that an agricultural sorter "may be designated according to work performed as . . . Nut Sorter (agriculture)."  DOT 529.687-186, 1991 WL 674781.  Furthermore, as will be described, infra, the relevant portions of both positions' duties (conveyor belts) are substantially similar such that the Court need not differentiate between them further.

information contained in the Dictionary of Occupational Titles."  (Id. at 38.)

The DOT provides, in relevant part, that the duties of a bench hand assembler are as follows: "positions screws in rims of balance wheels and secures screws in place, using screwdriver."  DOT 715.684-026, 1991 WL 679344.  The duties of a table worker are: "Examines squares (tiles) of felt-based linoleum material passing along on conveyor and replaces missing and substandard tiles."  DOT 739.687-182, 1991 WL 680217. Additionally, the duties of a nut sorter are:

> Removes defective nuts and foreign matter from bulk nut meats: Observes nut meats on conveyor belt, and picks out broken, shriveled, or wormy nuts and foreign matter, such as leaves and rocks. Places defective nuts and foreign matter into containers. May be designated according to kind of nut meat sorted as Almond Sorter (can. & preserv.); Peanut Sorter (can. & preserv.)

DOT 521.687-086, 1991 WL 674226.  For the purposes of comparison, the duties of an agricultural sorter are:

> Sorts agricultural produce, such as bulbs, fruits, nuts, and vegetables: Segregates produce on conveyor belt or table, working as crewmember, according to grade, color, and size, and places produce in containers or on designated conveyors. Discards cull (inferior or defective) items and foreign matter. Bunches, ties, and trims produce, such as asparagus, carrots, celery, and radishes. Picks out choice produce to be used as cappers (top layers on marketing containers). Packs produce in boxes, barrels, baskets, or crates for storage or shipment [PACKER, AGRICULTURAL PRODUCE (agriculture) 920.687-134]

DOT 529.687-186, 1991 WL 674781.

Plaintiff, citing Thomas v. Berryhill, 916 F.3d 307 (4th Cir. 2019), asserts that the VE's testimony in this case conflicts with the DOT descriptions of these jobs.  (J. Mot. at 16:8–9.)  Because each of these jobs are of an "industrial nature," with the bench hand and sorter position requiring work near a "conveyor," Plaintiff argues that these jobs

could conflict with her RFC, which requires her avoid exposure to workplace hazards, including "moving machine parts and tools."[9]  (Id. at 16:9–13; 16:12–13.)

Plaintiff's arguments are unavailing here.  As an initial matter, the Court notes that the ALJ assessed limitations with regard to exposure to "hazards" without clarifying what that term meant.  (See AR at 61.)  Defendant points out that the *DOT* job descriptions of table worker and agricultural sorter indicate that there is no exposure to moving mechanical parts.  (See J. Mot. at 18:10–20 ("the DOT descriptions . . .  specifically state that 'moving mechanical parts are 'not present'. . . in the performance of these occupations.") (internal quotations omitted)); see also DOT 529.687-186, 1991 WL 674781; DOT 739.687-182, 1991 WL 680217 ("Moving Mech. Parts: Not Present— Activity or condition does not exist").  The *DOT* descriptions, however, indicate that conveyors are utilized in both of these positions.  See DOT 529.687-186, 1991 WL 674781; DOT 739.687-182, 1991 WL 680217 (both discussing conveyor belts).  Machinery such as conveyor belts may well pose a hazard in the absence of moving mechanical parts.  Some courts have determined that exposure to machinery, even in the absence of "moving mechanical parts," is a departure from the DOT that an ALJ must address in the context of workplace hazards.  See McNeal v. Berryhill, No. CV 16-00760-TUC-BPV, 2018 WL 1466236, at *5 (D. Ariz. Mar. 26, 2018) (noting that although the DOT description of laundry worker did not involve moving mechanical parts, exposure to other machinery such as a wringer could still pose a hazard that the ALJ was required to clarify).  But see Ortiz v. Comm'r Soc. Sec. Admin, No. 1:14CV2845, 2015 WL 6742082, at *8 (N.D. Ohio Nov. 2, 2015) (finding no conflict

_____

[9] Plaintiff appears to base the "moving machine parts and tools" restriction (J. Mot. at 16:13) on the definition of workplace hazards in SSR 96-9p: "moving mechanical parts of equipment, tools, or machinery; electrical shock; working in high, exposed places; exposure to radiation; working with explosives; and exposure to toxic, caustic chemicals.  1996 WL 374185, at *9.  Additionally, "proximity to moving mechanical parts" is defined as: "exposure to possible bodily injury from moving mechanical parts of equipment tools, or machinery."  Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, app. D (1993).

when the DOT description specifically noted that humid conditions were "not present.")
This conflict seems especially apparent here, given that the ALJ did not inquire as to the
specific types of hazards Plaintiff would need to avoid.  (See AR at 61.)

Even if the Court assumes that the ALJ erred by not conducting a further inquiry to
resolve the conflict between the VE's testimony and DOT's description of the use of
conveyor belts in the agricultural sorter and table worker positions, however, the error is
harmless because the bench hand occupation the VE identified supported the ALJ's step
five determination.  See Rounds v. Comm'r Soc. Sec. Admin., 807 F.3d 996, 1007 (9th
Cir. 2015) ("[T]he [ALJ's] error was harmless because it was 'inconsequential to the
ultimate nondisability determination.'") (quoting Molina, 674 F.3d at 1115 ).  The DOT
description of the bench hand occupation also notes that it does not involve exposure to
moving mechanical parts.  See DOT 715.684-026, 1991 WL 679344 ("Moving Mech.
Parts: Not Present - Activity or condition does not exist").  Although Plaintiff argues that
the bench hand job is of an "industrial nature," (J. Mot. at 16:9.), the DOT description
does not indicate any other exposure to machinery or moving mechanical parts of
equipment and tools that would arguably rise to the level of a workplace hazard.  See
DOT 715.684-026, 1991 WL 679344 ("positions screws in rims of balance wheels and
secures screws in place, using screwdriver.").  When compared with the requirements of
the bench hand position, Plaintiff's arguments fall short of identifying an obvious or
apparent conflict with her RFC.  See Gutierrez, 844 F.3d at 808.  Further, the Court
cannot rely on common experience to find that any potential exposure to workplace
hazards would exist because the duties of a bench hand are not commonly known to the
public.  See Michael Louis W. v. Kijakazi, No. 20CV2277-LL(MSB), 2022 WL
2701988, at *19 (S.D. Cal. July 12, 2022), report and recommendation adopted, No.
20CV2277-LL-MSB, 2022 WL 2918613 (S.D. Cal. July 25, 2022) (holding that the
Court could not "rely on common experience to find that more than occasional overhead
reaching is involved because the duties of an assembler and a material distributor are not
commonly known to the public").

The ALJ only needed to identify one occupation that exists in significant numbers in the national economy to satisfy the Social Security Administration's burden at step five.  See Wolfe v. Astrue, No. 09-CV-922-BR, 2010 WL 3222109, at *7 (D. Or. Aug. 13, 2010) (citing 20 C.F.R. § 416.920(a)(4)(v)).  While there is no bright line number to reference in determining whether the representative jobs exist in "significant numbers," other courts have found substantial evidence at step five based on job numbers well below 100,000.  See Gutierrez, 740 F.3d at 529 (finding 25,000 jobs nationally to be a significant number); see also Garner v. Saul, 805 F. App'x 455, 459 (9th Cir. 2020) (finding 30,000 jobs of one occupation nationally to meet the statutory standard).  Accordingly, the Court finds that the existence of 102,000 bench hand positions (AR at 38) illustrates that the representative job exists in significant numbers, even without taking the agricultural sorter and table worker positions into account.

The Court therefore concludes that although the ALJ (1) erred by failing to ask the VE about any potential conflicts, and (2) could have erred by failing to conduct a further inquiry to resolve the conflict between the VE's testimony and DOT description in the agricultural sorter and table worker positions, any error was harmless because there was no conflict between the VE's testimony and the DOT's requirements with regard to the bench hand occupation identified by the VE.  Accordingly, the ALJ did not err in relying on the VE's testimony during the hearing.

## VII.   CONCLUSION AND RECOMMENDATION

For the reasons set forth above, the Court concludes that the ALJ did not err in determining that Plaintiff is not disabled.  Accordingly, the Court **RECOMMENDS** that District Judge Benitez issue an Order: (1) approving and adopting this Report and Recommendation; (2) denying Plaintiff's request for remand; (3) affirming the decision of the Commissioner; and (4) directing that judgment be entered in Defendant's favor.

**IT IS HEREBY ORDERED** that no later than **August 8, 2023**, any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

1   **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with

2   the Court and served on all parties no later than **August 15, 2023**.  The parties are

3   advised that failure to file objections within the specified time may waive the right to

4   raise those objections on appeal of the Court's order.  See Turner v. Duncan, 158 F.3d

5   449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1157 (9th Cir. 1991).

6   **IT IS SO ORDERED.**

7   Dated:  July 25, 2023

Honorable Lupe Rodriguez, Jr.
United States Magistrate Judge